

# In the Missouri Court of Appeals
## Western District

RANDY W. NETHERTON, MICHAEL L.
NETHERTON and SHERYL N. PERRY,
                Respondents,

v.

SEAN M. NETHERTON,
                Appellant,

TRAVIS PERRY,
                Respondent.

)
)
)
)
)
)
)
)
)
)
)

WD82579

FILED:  December 31, 2019

## APPEAL FROM THE CIRCUIT COURT OF CLAY COUNTY
### THE HONORABLE TIMOTHY J. FLOOK, JUDGE

### BEFORE DIVISION FOUR: KAREN KING MITCHELL, CHIEF JUDGE, PRESIDING,
### LISA WHITE HARDWICK AND CYNTHIA L. MARTIN, JUDGES

Sean Netherton ("Sean")[1] appeals from the circuit court's judgment finding that

the first and second amendments to his grandmother's trust, her new will, and change

of beneficiary forms for her Prudential and Lincoln Financial accounts, all of which

named as beneficiaries him and his cousin, Travis Perry ("Travis"), were null and void

because they were executed at a time when she lacked sufficient mental capacity and

were procured as a result of Sean's undue influence.  The court further found that his

grandmother's original trust, will, and beneficiary designations on her accounts, all of

which named as beneficiaries her children, Randy Netherton, Michael Netherton, and

---

[1] Because the parties share the same surnames of Netherton and Perry, we will refer to them individually by their first names.  No familiarity or disrespect is intended.

Sheryl Perry (collectively, "Respondents"), were valid.  On appeal, Sean contends the circuit court erred in not allowing him to argue, during closing argument, that a settlement offer that Respondents' counsel made to his grandmother's counsel in a different case constituted an admission of his grandmother's competency to execute the disputed documents.  He argues that the court further erred in giving instructions that required him to prove his grandmother had the requisite mental capacity when she executed the trust amendments and change of beneficiary forms.  For reasons explained herein, we find no error and affirm.

**FACTUAL AND PROCEDURAL HISTORY**

In 2011, Osta Ann Netherton ("Ann") and her husband, Morris Netherton ("Morris"), executed estate planning documents designating how they wanted their estates divided, who the beneficiaries would be, and who would make decisions if they were unable to do so themselves.  In the Ann Netherton Trust Agreement, dated June 20, 2011, Ann named Respondents as equal beneficiaries.  Ann named herself trustee and Respondents as successor co-trustees in the event of her death, resignation, adjudication to be incompetent, or inability to serve as trustee.  At the same time, Ann executed a durable power of attorney appointing Sheryl as her agent.  If, for some reason, Sheryl could not serve as Ann's agent, the durable power of attorney appointed Randy as her successor agent.  In December 2011, Ann and Morris executed the Morris and Ann Netherton Trust, which provided that, upon the death of the last of them, Respondents would receive the trust assets.  Ann also executed a will, which provided that all of the property of her probate estate would be distributed to Respondents as

trustees of the Morris and Ann Netherton Trust.  Thus, Respondents were Ann's beneficiaries under all of the estate planning documents that Ann executed in 2011.

Morris died in November 2012.  Ann was capable of managing her affairs until late summer 2015, when she had three mini strokes.  Ann was approximately eighty years old at the time.  Randy left his home in Colorado to live with and care for Ann in her Gladstone home until December 2015, when Ann was discharged from rehabilitation.  Ann had another stroke in June 2016.  Randy and Sheryl took care of Ann while she was hospitalized following this stroke.  The second stroke was "fairly significant," and Ann's doctors noted that, after this stroke, she exhibited functional decline and poor insight.  On August 28, 2016, Dr. Nancy Russell, Ann's primary care physician for over thirty years, found that Ann was "mentally confused, not able to make good decisions for her safety and not taking her medications properly."  Therefore, Dr. Russell concluded that Ann was "mentally incompetent and not able to make her own decisions regarding her health and financial matters."

In December 2016, Dr. Eric Ecklund-Johnson, a psychologist, performed a neuropsychological evaluation of Ann.  Dr. Ecklund-Johnson noted Ann's previously-diagnosed conditions of bipolar disorder, stroke, obstructive sleep apnea, intracranial hemorrhage, coronary artery disease, carotid artery stenosis, hypertension, hyperlipidemia, diabetes, and tremor.  Dr. Ecklund-Johnson's impressions of Ann were:

> Neuropsychological findings were significant for evidence of deficits in several areas including complex attention, processing speed, executive functions, memory (primarily efficiency of initial encoding), and visuospatial processing.  Although she reported few problems with daily functioning, [Ann]'s cognitive profile was consistent with a mild dementia syndrome and was suggestive of diffuse/multifocal brain dysfunction, likely

3

due to cerebrovascular disease to a significant extent given her medical history.

Dr. Ecklund-Johnson's recommendations included the statement: "Most individuals with similar neuropsychological profiles experience significant difficulty with complex activities of daily living, such as managing finances and medications."

On February 13, 2017, Ann fell at her home and suffered an acute compression fracture of her back as a result of the fall. On February 17, 2017, four days after she fell but before she went to the hospital, Ann signed a first amendment to her trust that deleted her original trust's provision naming Respondents as successor trustees and replaced it with a provision naming Sean as the sole successor trustee. Ann was admitted to the hospital for intractable pain due to her spinal fracture on February 24, 2017.

On February 27, 2017, Sean arranged for Ann's financial advisor to come to Ann's bedside in the hospital so that Ann could sign change of beneficiary forms naming Sean as 75% beneficiary and Travis as 25% beneficiary of her Prudential and Lincoln Financial accounts. At the time the financial advisor presented the documents for Ann to sign, he was aware of Dr. Russell's letter finding Ann incompetent, and he did not disagree with that finding.

The day after Ann signed the change of beneficiary forms on her Prudential and Lincoln National accounts, a doctor at the hospital found Ann's speech was "unintelligible at times," that she "had difficulty recalling the date" and that barriers to her discharge from the hospital included her "[d]ecreased insight, cognitive impairment, [and] risk for falls." Shortly thereafter, on March 5, 2017, Dr. Patrick J. Murray, a psychologist, evaluated Ann and noted that she "presented with depressive symptoms,

4

history of treatment for bipolar disorder, cognitive deficits, mild anxiety, and adjustment concerns." Dr. Murray further observed that she had confusion and memory loss and that a mental examination showed that she had "limited to poor insight."

On April 3, 2017, Randy filed an application for appointment of a guardian and conservator for Ann. In his petition, Randy alleged that a guardianship was necessary because Ann was unable to receive and evaluate information or communicate decisions to such an extent that she lacked the capacity to meet essential requirements for food, clothing, shelter, safety, or other care such that serious physical injury, illness, or disease was likely to occur because of her physical or mental condition, which he described in detail. Randy further alleged that a conservatorship was necessary because Ann was unable to receive and evaluate information or to communicate decision to such an extent that she lacked the ability to manage her financial resources because of her physical or mental condition. Ann, who was represented by counsel, contested the guardianship and conservatorship.

On May 18, 2017, while Ann was a patient at Liberty Health and Wellness nursing home, she signed a second amendment to her trust and a new will, both of which made Sean a 75% beneficiary and Travis a 25% beneficiary of her assets. That same day, Dr. Dennis Drews, Ann's physician who had been treating her since March 2017, examined her and determined that she was suffering from dementia and, likely, Alzheimer's disease. Ann was taking medication for dementia, along with medications for Parkinson's disease, delusions, hallucinations, and bipolar disorder. Dr. Drews noted that Ann was unable to answer questions and was incapable of making medical and financial decisions. In Dr. Drews's medical opinion, Ann did not have the capacity

to be able to read, appreciate, and understand the second amendment to her trust and the new will she signed that day.

Stephanie Ramirez, Ann's speech therapist, provided cognitive and speech/language therapy to Ann and interacted regularly with her between May 9, 2017, and May 22, 2017. When Ramirez initially examined Ann on May 9, 2017, she found Ann's cognition to be severely impaired. On May 18, 2017, the day Ann signed the second amendment to her trust and the new will, Ramirez noted that Ann's attention span was less than one minute and that she was "very distracted." Ramirez ultimately discharged Ann from therapy on May 22, 2017, due to Ann's non-compliance, decreased participation, and poor progress with the skilled therapy program. In Ramirez's "Analysis of Functional Outcome/Clinical Impression," she stated:

> [Ann] continues to demonstrate poor judgment and limited insight into disease process. She often closes eyes throughout treatment session and requires up to 20 redirections throughout the session. She continues to present with severe cognitive deficits characterized by decreased memory. Poor sustained attention. Decreased problem-solving and variable levels of orientation alertness. No carryover of learning noted.

In Ramirez's opinion, over the course of the two weeks that she treated Ann, Ann demonstrated severe cognitive decline.

Meanwhile, in the guardianship and conservatorship proceeding, Ann's counsel and Randy's counsel entered into a stipulation on July 21, 2017, agreeing that an emergency existed that required the appointment of a temporary guardian and conservator. The parties stipulated to the court's appointing the Clay County Public Administrator as Ann's temporary guardian and conservator. Three days later, on July 24, 2017, the court entered a judgment finding that Ann was totally incapacitated and

totally disabled and appointing the Clay County Public Administrator as Ann's guardian and conservator.

Ann died on July 28, 2017. On August 8, 2017, Ann's new will was ordered admitted to probate as her will. Two weeks later, Respondents filed a petition to contest Ann's new will, to admit her original will, and to set aside the changes to her beneficiary designations on her Prudential and Lincoln Financial accounts on the basis that Ann was not legally competent to execute the new will or to change the beneficiaries on her accounts. Respondents also filed a petition to register the original Ann Netherton Trust, to declare Respondents to be the successor trustees and sole beneficiaries of that trust, and to declare that the first and second amendments to the trust were null and void because they were executed after Ann was declared mentally incompetent. The court consolidated the two cases. Prior to trial, Travis, who was originally named as a plaintiff along with Respondents, was realigned as a party defendant, with his own separate counsel. Although Travis was a party defendant, he agreed with Respondents that the first and second amendments to Ann's trust, the new will, and the changes to her beneficiary designations were null and void due to Ann's incompetency.

The cases proceeded to a jury trial. Midway through the trial, Respondents moved to amend their pleadings to conform to the evidence to include a claim that the instruments at issue were procured as a result of undue influence. Following the presentation of evidence, the court determined that the fact issues of Ann's capacity and any undue influence would be submitted to the jury. The jury reached verdicts finding that the first and second amendments were not valid amendments to Ann's trust, the new will was not Ann's last will and testament, and the change of beneficiary forms

for the Prudential and Lincoln National accounts were not valid contracts. The court accepted the jury's verdicts. The court then entered a judgment declaring that the first and second amendments to Ann's trust, the new will, and the change of beneficiary forms were null and void because they were executed at a time when Ann lacked sufficient mental capacity and were procured as a result of Sean's undue influence. The court registered Ann's original trust as a valid trust indenture, vacated the August 8, 2017 order admitting the new will to probate and entered a separate order of probate for her original will, and declared that the Prudential and Lincoln National contracts were restored to the beneficiary designations as existed on the day before the invalid change of beneficiary forms were signed and that any withdrawals or transfers of funds to Sean pursuant to the change of beneficiary forms were void and invalid. Sean appeals.

### ANALYSIS

Sean's Points I and II concern the timeliness of the filing of his notice of appeal, an issue this court directed the parties to address in their briefs. The circuit court entered its judgment on December 4, 2018. Sean filed his motion for new trial on December 10, 2018, which was timely because it was filed within thirty days after the judgment was entered. Rule 78.04. The docket sheet on Case.net indicates that the court entered an order denying Sean's motion for new trial on January 18, 2019, which made the court's judgment final that day under Rule 81.05(a)(2)(A). Thus, pursuant to Rule 81.04(a), Sean's notice of appeal was due ten days later, which was January 28, 2019. Sean did not file his notice of appeal until February 25, 2019.

Case.net's eNotice History indicates, however, that the court did not notify the parties of its January 18, 2019 order denying Sean's motion for new trial until February

8

20, 2019.  Rule 74.03 provides that, when the court fails to provide notice of the entry of an order or judgment, "the order or judgment shall be set aside for good cause shown upon written motion filed within six months from the entry of the order or judgment." Here, no party filed a written motion asserting good cause to set aside the January 18, 2019 order denying Sean's motion for new trial.

Instead, on February 21, 2019, the court *sua sponte* set aside its January 18, 2019 order and entered a new order denying the motion for new trial.  Rule 74.06(a) allows the court to correct, at any time of its own initiative, "[c]lerical mistakes in judgments, orders, or other parts of the record and errors therein arising from oversight or omission."[2]  The court's failure to provide notice of the entry of its January 18, 2019 order was a clerical mistake that the court properly corrected pursuant to Rule 74.06(a) when it *sua sponte* set aside that order and entered its February 21, 2019 order.  *See McGuire v. Kenoma*, LLC, 447 S.W.3d 659, 663 (Mo. banc 2014) (noting that the court retains jurisdiction over its records to ensure their accuracy and that the correction of a clerical mistake "cannot be used to add anything to the judgment that is not in some way already reflected in the record").  Therefore, the February 21, 2019 order was binding and enforceable, and Sean's notice of appeal, filed within ten days of the entry of that order, was timely filed.[3]

In Point III, Sean asserts the circuit court erred in sustaining Respondents' objection to his attempt to refer, during closing arguments, to a rejected settlement offer that Respondents' counsel made to Ann's counsel in the guardianship and

---

[2] Rule 74.03 expressly states that it does not "preclude relief under Rule 74.06."

[3] Because we find that the notice of appeal in this case was timely filed, we deny Sean's motion to file a late notice of appeal in case number WD82598.

conservatorship proceeding.  Before trial, the court granted Respondents' motion in limine to exclude evidence of settlement-related discussions between attorneys or parties in the guardianship and conservatorship case.  During the trial, however, Travis's counsel offered into evidence Ann's counsel's case file, Exhibit 912.  This exhibit included an email from Respondents' counsel to Ann's counsel, sent on May 9, 2017, offering to settle the guardianship and conservatorship case and a rent and possession case that Respondents had filed against Sean.[4]  The terms of the settlement offer were that (1) Ann would agree to withdraw her opposition to the application for appointment of guardian and conservator and Respondents would agree to her selecting the guardian and conservator; (2) Ann would "reverse" any amendments to the Ann Netherton Trust and would "reverse" any changes to beneficiary designations that occurred after August 23, 2016; and (3) Respondents would dismiss their pending petition for rent and possession against Sean, allow him to reside in the residence through June 30, 2017, and forego any claims they had to past due rent and expenses.  Respondents did not object to the admission of any of Exhibit 912, including the settlement offer.[5]

During closing argument, Sean's counsel prefaced his comments about the settlement offer by telling the jury, "You're about to hear a bombshell."  He then said:

> If you write down anything in your notes, write this down.  Exhibit #912, bates-stamped as [Travis's counsel] called it, 88 through 89.  This was introduced into evidence by them.  It came in without objection, and it tells you everything you need to know.

---

[4] The record indicates that, at the time, Sean was living in one of the rental properties owned by Ann's trust and was approximately $8,000 behind in his rent payments.

[5] Respondents assert in their brief that the settlement offer in Exhibit 912 was "inadvertently admitted, as two pages out of hundreds of other documents contained in [Ann's counsel]'s legal file."

10

This is a letter from [Respondents' counsel] dated May 9, 2017. Now remember, they're telling you all week, in May she was not competent. May 9 –

At this point, Respondents' counsel objected, asserting that Sean's counsel was "just about to tell the jury again about my letter that includes a settlement offer that we had; that was the date. And he's trying to do it again. And you've already told him not [to] address it." In response, Sean's counsel told the court, "It's admitted into evidence by them without objection, Your Honor. Your Motion in Limine – they admitted it into evidence. It came in without objection. It's in evidence, Your Honor. I didn't violate your motion. They introduced it. I didn't offer it." The court sustained Respondents' objection and directed the jury to "disregard that last comment."

On appeal, Sean contends the court erred in sustaining Respondents' objection to his argument and directing the jury to disregard his counsel's comments on the settlement offer. He argues that, because the settlement offer was admitted into evidence without objection, he should have been allowed to use it "for any purpose."

The circuit court has broad discretion in ruling on the propriety of closing argument. *Dieser v. St. Anthony's Med. Ctr.*, 498 S.W.3d 419, 438 (Mo. banc 2016). We will reverse only if we find an abuse of discretion. *Id*. An abuse of discretion occurs if the ruling "'is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.'" *State ex rel. Mo. Highways & Transp. Comm'n v. Boer*, 495 S.W.3d 765, 769 (Mo. App. 2016) (quoting *Lozano v. BNSF Ry. Co.*, 421 S.W.3d 448, 451 (Mo. banc 2014)).

"The permissible field of closing argument is a broad one."  *Whisenand v. McCord*, 996 S.W.2d 528, 531 (Mo. App. 1999) (citation omitted).  "[A]s long as counsel confines himself to the evidence and does not go beyond the issues and urge prejudicial matters or urge a claim or defense which the evidence does not justify, he is to be given wide latitude in his comments."  *Id.* (citation omitted).

Sean asserts that he should have been allowed to argue that Respondents' request in the settlement offer that Ann "reverse" any amendments to the trust and any changes to beneficiary designations that occurred after August 23, 2016, constituted an admission by Respondents that Ann was competent to execute estate planning documents in May 2017 and, therefore, she was competent to execute the first and second amendments to her trust, her new will, and the change of beneficiary forms that she signed in February and May 2017.

A settlement offer is not an admission.  *City of Kansas City v. N.Y.-Kan. Bldg. Assocs., L.P.,* 96 S.W.3d 846, 862 (Mo. App. 2002).  This is because "[p]ublic policy favors the settlement of disputed claims out of court and offers of settlement are treated as offers to obtain peace rather than an admission . . . to be held against the offer[o]r." *Id.* (citation omitted).  Thus, Respondents' settlement offer in the guardianship and conservatorship proceeding did not constitute a legal admission of the contested issue in that case, which was Ann's competency – the same contested issue in this case.

Moreover, Sean's proposed argument, which appears to be that one of the terms of the offer constituted an admission of Ann's competency, was contradicted by the language of the settlement offer as a whole.  The first term of the settlement offer was that Ann withdraw her opposition to the appointment of a guardian and conservator.

Given that the settlement offer was conditioned upon the appointment of a guardian and conservator for Ann, any argument by Sean that Respondents actually admitted in that same offer that Ann was competent was at best confusing, if not illogical and unjustified, in the context of the settlement offer in its entirety.

We recognize the general rule that counsel's wide latitude to suggest inferences in closing arguments includes even those inferences that are "'illogical or erroneous.'" *Nelson v. Waxman*, 9 S.W.3d 601, 606 (Mo. banc 2000) (quoting *Moore v. Mo. Pac. R.R. Co.*, 825 S.W.2d 839, 844 (Mo. banc 1992)). The rationale for this rule is that, "if this court should reverse every case where a lawyer made an unsound argument or drew an unwarranted conclusion from given premises, few cases would stand the test." *Atkinson v. United Rys. Co.*, 228 S.W. 483, 484 (Mo. 1921). Simply because the circuit court's allowing an illogical or erroneous argument does not necessarily constitute reversible error, however, does not conversely mean that the court's refusal to allow such argument constitutes an abuse of the court's broad discretion in determining the propriety of closing arguments. Under the circumstances, we do not find that the circuit court's refusal to allow Sean to make his proposed argument was "'so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.'" *Boer*, 495 S.W.3d at 769 (quoting *Lozano,* 421 S.W.3d at 451). Point III is denied.

In Point IV, Sean contends the circuit court erred in giving jury instructions that erroneously placed upon him the burden of proving, by clear and convincing evidence, Ann's mental capacity when she executed the trust amendments and the change of beneficiary forms. Whether a jury was instructed properly is an issue of law that we

13

review *de novo*. *Edgerton v. Morrison*, 280 S.W.3d 62, 65 (Mo. banc 2009). "Reversal for instructional error is appropriate when the instruction misdirected, misled, or confused the jury and resulted in prejudice." *Id.* at 66.

Instructions 8 and 24, proffered by Respondents, instructed the jury as to the burden of proof regarding Respondents' challenge to the validity of the first and second amendments to Ann's trust. Instruction 8, which concerned the first amendment to the trust, provided:

> In these instructions, you are told that your verdict depends on whether or not you believe certain propositions of fact submitted to you. The burden is upon the party who relies upon any such proposition to cause you to believe by clear and convincing evidence that such proposition is true.

> The burden is upon [Sean], proponent, to cause you to believe that the First Amendment to the Ann Netherton Trust dated February 17, 2017, is an amendment to the original trust agreement of Osta Ann Netherton.

> The burden is upon [Respondents], contestants, to cause you to believe their claim of undue influence as submitted in Instruction number 11.

> In determining whether or not you believe any proposition, you must consider only the evidence and the reasonable inferences derived from the evidence.

> If the evidence in the case does not cause you to believe a particular proposition submitted, then you cannot return a verdict requiring belief of that proposition.

Instruction 24, which concerned the second amendment to the trust, was identical to this instruction except it substituted "Second Amendment" in place of "First Amendment" and "May 18, 2017" in place of "February 17, 2017" in the second paragraph, and it

14

referenced a different instruction number for the second amendment's corresponding undue influence claim in the third paragraph.

Similarly, Instruction 14, also proffered by Respondents, instructed the jury as to the burden of proof regarding Respondents' challenge to the validity of the change of beneficiary forms. Instruction 14 stated:

> In these instructions, you are told that your verdict depends on whether or not you believe certain propositions of fact submitted to you. The burden is upon the party who relies upon any such proposition to cause you to believe by clear and convincing evidence that such proposition is true.
>
> The burden is upon [Sean], proponent, to cause you to believe that the Beneficiary Forms for Contracts with Prudential and Lincoln National dated February 27, 2017 are Change of Beneficiary Forms for Contracts with Prudential and Lincoln National entered into by Osta Ann Netherton and Prudential and Lincoln National.
>
> The burden is upon [Respondents], contestants, to cause you to believe their claim of undue influence as submitted in instruction number 17.
>
> In determining whether or not you believe any proposition, you must consider only the evidence and the reasonable inferences derived from the evidence.
>
> If the evidence in the case does not cause you to believe a particular proposition submitted, then you cannot return a verdict requiring belief of that proposition.

Sean argues that these instructions were erroneous because he had no burden to prove anything. He asserts that the court should have instead given his proposed instructions, which instructed the jury that only Respondents had the burden of proving, by clear and convincing evidence, that the first and second amendments to the trust

15

were not valid amendments to Ann's original trust and that Ann lacked the sufficient mental capacity to execute the change of beneficiary forms.

Sean's argument fails to recognize that, in cases challenging changes to estate planning documents, both parties bear burdens of proving different propositions. *See Rouner v. Wise*, 446 S.W.3d 242 (Mo. banc 2014) and *Ivie v. Smith*, 439 S.W.3d 189 (Mo. banc 2014). Specifically, "[i]n a suit challenging the validity of a trust due to lack of mental capacity to execute such a document, the proponents of the document have the burden to establish a prima facie case of due execution and of sound mind of the person executing the trust at the time it was executed." *Cima v. Rhoades*, 416 S.W.3d 320, 323-24 (Mo. App. 2013). In other words, the "party seeking to establish an original or amended trust . . . must establish that the settlor acted with adequate capacity." *Rouner*, 446 S.W.3d at 251 n.7. "The capacity required to create, amend, revoke, or add property to a revocable trust . . . is the same as that required to make a will." § 456.6-601, RSMo 2016. The evidence relied upon to establish the capacity to execute a valid trust or trust amendment must be clear and convincing. *Rouner*, 446 S.W.3d at 252. Once the proponent of the trust document makes a prima facie showing, "the contestant must adduce substantial evidence that the settlor lacked mental capacity to execute the trust." *Cima*, 416 S.W.3d at 324. The burden of proving mental capacity remains with the proponents throughout the trial, however. *See Hall v. Mercantile Trust Co.*, 59 S.W.2d 664, 671-72 (Mo. 1933).

Likewise, a suit challenging the validity of a beneficiary designation places similar burdens on both parties. The creation of a beneficiary designation is governed by contract law. *Ivie*, 439 S.W.3d at 204. "Under the common law, a contract is deemed

16

void if a party lacks the requisite mental capacity at the time of contracting – meaning mental capacity must be present for a contract to exist at all." *Id.* Hence, because "[m]ental capacity is required to make a contract[,] . . . mental capacity is required to make a beneficiary designation." *Id.* The capacity required to make a beneficiary designation is contractual capacity, which is a higher standard than testamentary capacity. *Id.* at 205. Pursuant to contract law, the party requesting enforcement of a contract has the burden of proving the existence of a valid contract by clear and convincing evidence. *Webb v. Webb*, 498 S.W.2d 757, 758 (Mo. 1973); *J.H. v. Brown*, 331 S.W.3d 692, 699 (Mo. App. 2011). Therefore, applying these contract principles to challenges to a beneficiary designation, the party requesting the enforcement of the beneficiary designation has the burden of establishing, by clear and convincing evidence, that the person who made the designation had the contractual capacity to do so. Once the proponent makes a prima facie showing, the contestant then has the burden of proving that the person who made the designation lacked the requisite capacity. *See Ivie*, 439 S.W.3d at 199 n.10.

Instructions 8, 24, and 14 required Sean to prove the validity of the trust amendments and the change to beneficiary forms – including Ann's capacity to execute them – by clear and convincing evidence, and they required Respondents to prove their claim of undue influence in the execution of those instruments by clear and convincing evidence.[6] Therefore, the instructions correctly ascribed the burdens of proof applicable

---

[6] Because Respondents offered these instructions, we presume, without deciding, that Respondents are correct that they bore the burden of proving their claim of undue influence by clear and convincing evidence. *See Ivie*, 439 S.W.3d at 199 n.10.

to both parties.  Sean's proposed instructions, which did not place upon him any burden to establish the validity of the documents at issue, would have misstated the law.  The circuit court did not err in instructing the jury.  Point IV is denied.

### CONCLUSION

The judgment is affirmed.

_____
**Lisa White Hardwick, Judge**

All Concur.